## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                           )
**JESSICA SANTIAGO, on behalf of V.S., a**  )
**minor,**                             )
                           )
        **Plaintiff,**            )          **Civil Action No.**
                           )          **08-40248-FDS**
        **v.**                   )
                           )
**MICHAEL J. ASTRUE, Commissioner,**  )
**Social Security Administration,**       )
                           )
        **Defendant.**          )
_____

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

**SAYLOR, J.**

      This is an appeal of the final decision of the Commissioner of the Social Security

Administration denying Plaintiff Jessica Santiago's application for supplemental security income

("SSI") benefits on behalf of her minor son, V.S.  Santiago appeals the denial of her application

on the grounds that the decision is not supported by substantial evidence under 42 U.S.C. §§

405(g) and 1383(c)(3).  In her application for SSI, Santiago, who submitted an onset date of

January 1, 2003, stated that V.S. suffered from a hearing problem and ADHD.  (Administrative

Record ("AR") 91-93).  She now disputes the administrative law judge's holding that her son is

not "disabled" within the meaning of the Social Security Act, 42 U.S.C. §§ 416.924 (c), (d).

      Pending before the Court is Santiago's appeal and the Commissioner's motion to affirm.

For the reasons stated below, the decision of the Commissioner is reversed, and the matter is

remanded for further proceedings.

**I.**       **Background**

The claimant, V.S., was born in September 1994. (AR 224).  At the time of the most recent hearing, he was thirteen years old and in the seventh grade.  (AR 351, 358).  He attends Southbridge Public Schools.

**A.     Hearing Problems**

**1.     Medical Diagnosis**

At a very young age, V.S. suffered from acute otisis media.  (AR 197).[1]  When he was two years old, ventilating tubes were inserted to address this problem.  (AR 209-211).  The ventilating tubes seemed to adequately address his hearing problems for some time and, in fact, the problems did not immediately return when the tubes came out.  (AR 205, 209-210).  However, V.S. began to experience hearing problems again when he began attending kindergarten.  (AR 205).  In July 2000, Dr. David Keller, V.S.'s pediatrician, conducted a hearing examination and noted a "small conductive loss" in his right ear and a "minor drop at 4000 cycles in both ears."  (AR 207-208).  Dr. Keller diagnosed V.S. with "right serious otitis media" and recommended "leaving this alone for now and see[ing] what happens over the academic year."  (*Id.*).

In January 2002, V.S. was seen by Dr. Andrea Chiaramonte, an ear, nose, and throat physician.  (AR 205-206).  Dr. Chiaramonte noted that V.S. "always turns everything to loud volumes and the teachers have been complaining at school."  (AR 205).  She also noted that he had failed his hearing examinations at school and at his pediatrician's office.  (*Id.*).  Dr. Chiaramonte ultimately diagnosed V.S. as suffering from "bilateral conductive hearing loss" and

_____

[1] Otitis media is an inflammation or infection of the middle ear.  The acute variety involves symptoms that are more pronounced than the non-acute type.  It is quite common in children up to age 3.  National Institute of Deafness and Other Communication Disorders, http://www.nidcd.nih.gov/health/hearing/otitism.asp (last visited March 29, 2010).

recommended the placement of another set of tubes in his ears and removal of his adenoids. (AR 205-206). V.S. underwent these procedures in January 2002. (AR 202, 204).

Despite these efforts, in late January 2003, Dr. Chiaramonte diagnosed V.S. as having "conductive loss in all frequencies" for his right ear. (AR 202). Although Dr. Chiaramonte recommended placing tubes in his ears once again, V.S.'s mother declined. (AR 202-203). Instead, they agreed to try Rhinocort twice a day for six weeks to see what improvement, if any, that would provide. (*Id.*).[2] V.S. did not show up for his follow-up visit with Dr. Chiaramonte in mid-March or for a later-scheduled follow-up in May. (AR 197, 201).

In late March 2003, V.S. was seen by Dr. John Renneburg, an allergist, who noted that the Rhinocort treatment was of no help. (AR 198). He also noted that V.S. was in second grade "and school is going okay." (AR 198-199). Dr. Renneburg diagnosed V.S. with chronic rhinitis and recommended Bromphenex and Rhinocort treatment, as well as additional testing and a follow-up appointment. (AR 198-199).[3]

In December 2003, V.S. was examined by Dr. Christopher Hartnick, a pediatric otolaryngologist. Dr. Hartnick noted that V.S. suffered from "mixed hearing loss with a prominent conductive component." (AR 235). A month later, in January 2004, he performed surgery on V.S. to once again replace the tympanostomy tubes. (AR 234). At a follow-up

---

[2] Rhinocort is a nasal spray containing budesonide, a corticosteroid. It prevents the release of substances in the body that cause inflammation. Uses include, but are not limited to, treatment of nasal symptoms such as congestion, sneezing, and runny nose caused by seasonal or year-round allergies. *See* Drug Information Online, http://www.drugs.com/rhinocort.html (last visited March 29, 2010).

[3] Bromphenex is used for the temporary relief of cough and upper respiratory tract symptoms, including nasal congestion, associated with allergy or common cold. *See* Drug Information Online, http://www.drugs.com/ppa/brompheniramine-maleate-pseudoephedrine-hydrochloride-dextromethorphan-hydrobromide.html (last visited March 29, 2010).

appointment in March 2003, Hartnick observed that V.S. "[h]as a high frequency sensorineural hearing loss of mild to moderate severity." (AR 233). Dr. Hartnick also suggested that V.S. would benefit from the use of a FM hearing assistive device in the classroom. (*Id.*).[4] Hartnick also recommended, and later performed, a tonsillectomy. (AR 232-233).

In May 2004, Dr. Angela Beeler, a pediatrician, noted that V.S. suffered from recurrent and prolonged serious otitis media, which had led to hearing loss. (AR 212). She also noted that no hearing aid was used, and that V.S. was able to speak understandably. (AR 212-213).

In March 2004, during a follow-up audiogram, Dr. Hartnick noted that V.S. showed improvement at all frequencies, but he still characterized the deficit as "a high frequency sensorineural hearing loss of mild to moderate severity." (AR 233).

In late October 2004, Dr. Hartnick examined V.S. again and indicated that he "has done quite well over the last several months but has a persistent high frequency sensoneurial hearing loss." (AR 230).

In April 2005, Dr. Hartnick reported that "[V.S.] has done fabulously since my last evaluation. He has had no recent ear infections. He himself feels his hearing is unchanged and that he is doing well. His hearing test agrees with his assessment that his hearing is unchanged." (AR ).

In February 2006, V.S.'s earscan hearing test results showed that his "audiometric thresholds" indicated bilateral deficits at the 3000 Hz level and higher. (AR 286).[5] A similar

---

[4] The FM receiver aparatus requires both V.S. and the teacher to wear headsets. The teacher speaks into her headset, and V.S. can hear her more clearly through his own.

[5] Normal hearing is typically in the range of 0 to 20 decibels (dB). On this test, V.S. had scores of 45, 45, 50, and 30 dB in the 3,000 to 8,000 Hz range for the right ear and 35, 35, 35, 25 for the left. (AR 286). http://www.earinfo.com/how-to-read-a-hearing-aid-test/.

test from August 2006 showed further deficits in hearing loss, encompassing a broader frequency range.  (AR 323).[6]

In February of 2007, Dr. Keller noted that V.S. was having difficulty hearing at home. (AR 292).

## 2.   Administrative Hearing Testimony

At the September 17, 2007 administrative hearing, V.S. testified that his hearing problems had improved.  (AR 354-357).  He testified that, although he was told to wear the FM system at school, he didn't like to because his peers called him names.  (AR 354-355).[7]  Instead, he "sit[s] in the front of the class" and, when he does, he no longer has problems hearing.  (AR 356).

When he was asked to rank his hearing problems on a scale of 1 to 10—1 being no hearing problem and 10 being deaf—V.S. ranked himself as a two.  (AR 357).  The ALJ asked if it was a "teeny-weeny problem" and V.S. said that it was.  (*Id.*).

While V.S.'s mother did not believe that V.S.'s hearing problems had been resolved, she had not scheduled any additional appointments.  (AR 368-369).  Counsel acknowledged that there was no written evidence to contradict Dr. Hartnick's letter, which stated that V.S.'s hearing had been substantially improved.  (AR 369).

## B.   Learning Disability and Attention Deficit Disorder

### 1.   Psycho-Educational Evaluations

---

[6] In particular, V.S. had scores of 35, 25, 25, 35, 50, 50, 35 in the 500 to 8,000 Hz range for the right ear and 25, 25, 20, 35, 30, 50, 25 for the left.  (AR 323).

[7] V.S. testified that, while the FM unit only makes him look like "a kid using a Walkman," it makes the teacher sound funny to everyone else in the classroom.  He testified that other children "called him names" as a result, and that was the reason that he preferred not to wear the headset.  (AR 355).

5

In 2001, a "psycho-educational evaluation" of V.S. was performed by Marie Tuniewicz, a psychologist for the Southbridge Public Schools.  (AR 226-229).  V.S. was referred for this evaluation by his classroom teachers, who had expressed concern with his "readiness skills as well as weak fine motor skills."  (AR 226).  Tests administered by Dr. Tuniewicz showed that V.S.'s cognitive processing ability was in the average range.  (AR 227).  She concluded that his cognitive abilities were, in her opinion, average, but that a significant difference existed between his sequential processing skills (which were low average) and his overall achievement (which was borderline-low average). (AR 227-228).  This, she felt, "may be suggestive of a possible learning disability."  (AR 228).  She also found that he was restless, impulsive, distractable, and possessed a short attention span.  (AR 226-228).  She found his daily school performance to be "below expected levels despite reinforcment in an extended day program."  (AR 229).

In January 2004, when V.S. was in third grade, the Southbridge Public Schools conducted an "occupational therapy evaluation" of him.  (AR 240-241).  The evaluation noted that V.S. had been enrolled in occupational therapy intervention since he was in kindergarten "because of delays in the areas of visual motor integration, fine motor control and coordination, and visual perception.  (AR 240).  The results indicated that his performance was "within the average range overall," but "difficulty was noted in the areas of visual closure and spatial relations."  (AR 241).  He "exhibit[ed] age appropriate skills in the areas of fine motor control and coordination, visual motor integration, and visual perception." (*Id.*).  He was also "able to work very quickly and accurately when necessary."  (*Id.*).

Another psycho-educational evaluation of V.S. was conducted a few months later, in March 2004.  (AR 242-248).[8]  Dr. William P. Haddad, a licensed clinical psychologist, administered the evaluation.  (AR 248).   Dr. Haddad observed that "[o]n several occasions, [V.S.] completed the tasks in an impulsive manner, which resulted in careless errors."  (AR 242). A number of tests were administered, which showed that he had general cognitive ability in the low average range, average ability in verbal reasoning, and low average to average in all other ranges, except for arithmetic and word recognition (in which he scored in the borderline-low average range).  (AR 242-248).   His word recognition scores were found to be quite poor, as were his math skills.  (AR 246).[9]  Dr. Haddad also found that he suffered from "mild hyperactivity and impulsivity."  (AR 248).

In April 2007, V.S. and his mother were interviewed by a school psychologist, and V.S. was given a number of diagnostic tests.  (AR 174-196).  Again, his cognitive ability; verbal and non-verbal reasoning; ability to sustain attention, concentrate, and exert mental control; math calculation skills; and written expression abilities were all shown to be in the low-average to average range.  (*Id.*)  His broad reading skills were found to be in the low to low average range. (*Id.*)

### 2.    Medical Observations and Reports

In November 2003, V.S. saw his pediatrician, Dr. Keller.  Dr. Keller noted that he was hyperactive at home and school (AR 218).  He also advised V.S.'s mother to consider an

---

[8] The evaluation sheet indicated that V.S. had an individualized education plan in place.  An individualized education plan, or IEP, is a plan used to assist students requiring help in one or more academic areas.  In other words, it is a program designed to meet the "unique needs" of a child with an impairment. *See* Concord Special Education Parent's Advisory Committee,  www.concordspedpac.org.

[9] The ALJ noted that this may have been because of hearing difficulties.

attention-deficit evaluation should his academic issues not resolve after his hearing problems were addressed.  (*Id.*).

In June 2005, V.S. was evaluated by Dr. Kathleen Braden, a pediatrician with a subspecialty in developmental and behavioral pediatrics.  (AR 263-267).  In her evaluation form, Dr. Braden noted that "he worked very quickly, in fact too quickly, and made errors as a result. He groaned when presented with math questions obviously aware of his difficulty with math." (AR 264).  She noted that V.S. was in fifth grade but was "significantly below grade level despite the special educational interventions he [was receiving]. . . ."  (AR 266).  She further described him as being "of average intelligence with no significant differential between his verbal and his performance skills. . . ."  (*Id.*)  Her assessment was that he suffered from a "significant learning disability and an inattentive type of attention deficit disorder related at least in part to his hearing loss."  (*Id.*) (emphasis removed).  Among other things, she recommended that V.S. be provided access to "an FM system that works *all the time* as his hearing loss is sufficient to mean that [he] is missing information on a regular basis if people are speaking away from him or there is background noise."  (*Id.*) (emphasis in original).

In approximately July 2005, Dr. Braden e-mailed Dr. Keller with a diagnosis that V.S. suffered from "a language-based [learning disorder]. . . and ADD-inattentive type."  (AR 307). She noted that "his academic skills for reading decoding, spelling, and math [were] at a 2nd grade level. . . [and] his [r]eading in context [was] at a 3rd grade level."  (*Id.*).  At the time, V.S. was about to begin fifth grade.  (*Id.*).  Braden also recommended a Ritalin trial for treatment of ADD.  (*Id.*)[10]

---

[10] Attention Deficit Disorder (ADD) is defined as "a [disorder] of attention and impulse control with specific DSM criteria, appearing in childhood and sometimes persisting to adulthood.  Hyperactivity may be a

In August 2005, V.S. saw Dr. Keller, who noted that he was in fifth grade and was "a good student."  (AR 314).  He also noted that V.S. was diagnosed with probable ADHD and a learning disorder, as well as dyslexia.  (*Id.*).[11]  He wrote V.S. a prescription for Ritalin.  (*Id.*).[12]

In September 2005, Dr. Keller observed that "school is going well."  (AR 313).[13]  The follow-up form indicated that V.S. was on Ritalin and was "able to concentrate more[,] able to finish work, [and] able to function in [a] small classroom."  (*Id.*).[14]  It also showed that he was "now in [special education] class."  (*Id.*).  The form indicated that V.S. had "no problem" with home behavior or attention.  (*Id.*).  Finally, Keller's assessment of V.S. was that he had inattentive-type ADHD, as opposed to hyperactive or combined types.  (*Id.*).

A similar form was completed by Dr. Keller in October 2005.  Again, Dr. Keller indicated that V.S. was "able to concentrate[,] able to finish work[, and] function[] in the classroom."  (AR 311).  He also noted that V.S. "feels that he is learning more" in a "[s]mall

---

feature, but is not necessary for the diagnosis."  Marjory Spraycar, ed., Stedman's Medical Dictionary 26 (26th ed. 1995).

[11] Dyslexia is defined as an "impaired reading ability with competence level below that expected on the basis of the individual's level of intelligence, and in the presence of normal vision and letter recognition and normal recognition of the meaning of pictures and objects."  Marjory Spraycar, ed., Stedman's Medical Dictionary 26 (26th ed. 1995).

[12] Attention Deficit Hyperactivity Disorder (ADHD) is defined as "a disorder of childhood and adolescence manifested in home, in school, and in social situations by developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity."  Marjory Spraycar, ed., Stedman's Medical Dictionary 26 (26th ed. 1995).

[13] It appears that the ALJ misinterpreted this appointment as having occurred in May 2005.  The writing is somewhat unclear, but the month does appear to be indicated as a "9," and the paperwork falls in between visits which occurred in August 2005 and October 2005.  The error is harmless.

[14] Ritalin is a mild central nervous system stimulant. It affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control.  It is used to treat ADD, ADHD, and narcolepsy (an uncontrollable desire to sleep).  *See* Drug Information Online, http://www.drugs.com/search.php?searchterm=ritalin&is_main_search=1 (last visited March 29, 2010).

9

class room." (*Id.*).  Dr. Keller did note that the medication was wearing off by the time V.S.

arrived home from school.  (*Id.*).

In January 2006, Dr. Keller's follow-up form noted that V.S.'s behavior and attention

problems at home were "no problem" and that "school [was] going well," although he was "still

fidgety in class [with] 8 kid[s]."  (AR 303).  It also noted that he was "finish[ing] work[,]

concentrating [on] work[, and] not getting in[to] trouble."  (*Id.*).

At a subsequent visit to Dr. Keller's office in April 2006, V.S.'s mother reported

"excellent behavior at school and that a significant improvement in grades [had occurred] since

[he began]. . . medication last August (2005)."  (AR 299).  His grades had also improved from

"Bs/Cs to As/Bs" and he had "made Honor Roll twice in [the] last year."  (*Id.*).  V.S.'s mother

also reported that "[V.S.] has always been hyper at home, and [she had] not notice[d] a

significant difference when he [was] on medication. [His b]ehavior [was] not disruptive or

bothersome, [and she was] not concerned with home behavior."  (*Id.*).  Dr. Keller observed that

V.S. was "well appearing, well behaved, [and] cooperative," but also indicated that he now had

"combined"-type ADHD, where he had previously indicated "inattentive"-type back in

September 2005.

In February 2007, Dr. Keller noted that V.S. was in sixth grade and no longer in special

education classes.  (AR 292).  He also noted that his "report card [was] good" and that he was

"doing homework and finishing class work."  (*Id.*).

In May 2007, V.S. again saw Dr. Braden.  She noted that despite the fact that V.S. was in

sixth grade, he was continuing to have significant academic problems.  (AR 275-277).  She noted

that V.S. had an FM system to address his hearing problems, but only used it "intermittently" in

the fourth grade and "refuse[s] to use it" in the sixth grade.  (AR 275).  Apparently, the reason that V.S. refused to use the FM system is because "he fe[lt] it was stigmatizing."  (*Id.*).  Sitting up front near the teacher did not prevent him from being distracted and bothered by background noise.  (*Id.*).  Dr. Braden noted that V.S.'s "attention deficit disorder has been treated with Concerta, he has grown significantly since being placed on it and likely needs an increase in his dose."  (AR 275-276).[15]

In an e-mail from Dr. Braden to Dr. Keller that followed this visit, Dr. Braden expressed concern over V.S.'s progress.  (AR 290).  In particular, she indicated that although "the IQ testing from 2005 put him in the low average range, . . . he should still be making much better progress than I documented he had made yesterday."  (*Id.*).  She also expressed concern as to the amount of special education support V.S. was getting from his school and indicated that "according to [V.S.'s mom], he has none!"  (*Id.*).[16]  She concluded the email with "Lovely kid but oh my - does he need help!"  (*Id.*).

Dr. Keller conducted another follow-up appointment with V.S. in July 2007.  The report generated on that date indicated that V.S. was struggling at school more so than he had in the past.  (AR 288).  Dr. Keller noted that V.S. needed "frequent reminders in school[, did not] turn in homework[, and did not] take notes in class."  (*Id.*)  There was also a notation that the school was not following the IEP program.  (*Id.*).

### 3.    State Agency Evaluations

---

[15] Concerta is a central nervous system stimulant. It affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control.  Concerta is used to treat ADD and ADHD.  *See* Drug Information Online, http://www.drugs.com/concerta.html (last visited March 29, 2010).

[16] The ALJ concluded that this information that the mother gave to Dr. Braden was incorrect.  To support that conclusion, he cited to the presence of an IEP that had been in place for years prior to Dr. Braden's most recent report.  (AR 28) (citing AR 159-172, 100-119).

On a June 2004, Childhood Disability Evaluation Form, Dr. Joseph Litchman, a psychologist, and Dr. Robert Downes, a physician, concluded that V.S. suffered a severe impairment or combination of impairments that did not medically or functionally equal a listed impairment.  (AR 249-255).  In particular, they found that he had "less than marked" limitations in the domains of acquiring and using information, attending to and completing tasks, and caring for himself.  (*Id.*).  With regard to the acquiring and use of information domain, the examiners indicated that V.S. had "difficulty reading [and] writing."  (AR 251).  In the attending and completing tasks domain, the examiners noted that he was "distractable ('mild'); needs 'ample time' [and] 'reminders' to stay on tasks."  (AR 251).  Finally, with regard to the caring for himself domain, the examiners determined that V.S. "can be 'immature' ('cries easily,' 'oversensitive') [and has] difficulty] dealing [with] peers, at times."  (AR 252).  These impairments were deemed severe but not disabling.  (AR 254).[17]

A subsequent agency evaluation conducted in May 2005, found that the impairments suffered by V.S. were no longer severe.  (AR 256-261).  As a basis for this determination, the examiner noted that V.S.'s "mother denies [there being a] problem with ADHD. [She says that V.S.'s] [h]earing [is the] only issue."  (AR 259).

Dr. Downes and Dr. Siegel, a psychologist, completed another evaluation form in September 2005.  (AR 268-273).  V.S.'s impairments were found to be severe once again, but not of listing-level severity.  (AR 268).  He was deemed to have "less than marked" limitations

---

[17] This evaluation was based, in part, on the responses that two of V.S.'s teachers provided to a questionnaire.  (AR 120-129).  Within this questionnaire, the teachers noted that V.S. received five and one-half hours of special education services a day in small group and one-on-one formats.  (AR 120).  The teachers also noted V.S.'s need for ample time, assistance, and reminders in order to complete his tasks.  (AR 120-129).  They did state, however, that "given assistance he is able to complete daily classwork."  (AR 121).

in acquiring and using information and attending and completing tasks.  (AR 270).  V.S. was found to have no limitation in the remaining four domains.  (AR 270-271).

### 4.     School Records and Teacher Questionnaires

In June 2006, Venus Kane, a special education teacher, completed a school activities questionnaire.  (AR 173).  She assessed V.S.'s attention span, ability to work independently, attendance and ability to complete assignments on time, and response to changing routine to be "normal" compared to other children in the "resource room."  (*Id.*).  She noted that he was "very active physically and verbally" but exhibited an "excellent" ability to get along with others and "excellent" hygiene and self care.  (*Id.*).  She also noted V.S.'s use of his FM unit.  (*Id.*).

Dr. Keller also sent questionnaires to three of V.S.'s sixth grade teachers in 2007.  (AR 278-283).  In an e-mail to Dr. Braden, Dr. Keller described the assessments as "really remarkably low."  (AR 317).

### 5.     V.S.'s Individualized Education Plans (IEP's)

An IEP was created to address V.S.'s educational requirements for the period from March 31, 2004 through March 31, 2005.  (AR 114-116).  It was premised on the March 11, 2004 report of Dr. Haddad, who thought that V.S. fell in the borderline to low average range on intelligence tests and had "mild hyperactivity and impulsivity" problems.  (AR 114, 242-248).  According to the IEP, to facilitate learning, V.S. needed "distraction free (as possible) seating[,] small group or 1 to 1 instruction[,] concepts to be broken down into smaller parts[,] numerous redirection and repetition[,] and the teacher to monitor for accuracy on independent work."  (AR 115).[18]

---

[18] The 3/3/2005-3/3/2006 IEP also lists these same accommodations as being "necessary for [V.S.] to make effective progress."  (AR 103).  Likewise, the 3/3/2006-3/3/2007 IEP lists these accommodations, along with

13

A new IEP was implemented from March 3, 2005 through March 3, 2006.  (AR 100-112).  V.S. was designated for a "full inclusion program," in which IEP services would be "provided outside the general education classroom less than 21% of the time."  (AR 100).

In the IEP that spanned from March 3, 2006 through March 3, 2007, V.S. was placed in a "partial inclusion program," in which "IEP services [were] provided outside the general education classroom at least 21% of the time but no more than 60% of the time."  (AR 172).[19]

V.S. returned to a full inclusion program under an IEP spanning the period for June 14, 2007, through June 13, 2008.  (AR 187-196).[20]

## 6.   Administrative Hearing Testimony

At the time of the September 2007 administrative hearing, V.S. was in seventh grade. (AR 358).  He had never been held back a grade.  (*Id.*).

V.S. testified that he was still having a problem with paying attention at school, but that the medication he was taking helped "sometimes."  (AR 357).  He also testified that the medicine often wore off by the time he got home from school.  (AR 357-358).  V.S.'s mother testified that since he had been taking his medication, his distractability and impulsivity have decreased.  (AR 371, 374).

Evidence was presented, through both the testimony of V.S. and statements by his attorney, that during his fourth grade year (2004-2005) his impairments disabled him; that during

---

additional ones, including "read grade level material to him [and] charts, reference sheets, number lines and word banks to aid memory."  (AR 162).

[19] The record appears to indicate that, even when V.S. was in regular-education or "inclusion" classes, a special education teacher was present in the room to help him, if necessary.  (AR 173).

[20] The record indicates that V.S. may have been withdrawn from this IEP at some point.  (AR 292, 382).

his fifth grade year (2005-2006) he was not disabled; and that during his sixth grade year and thereafter (2006 to present), he has again been disabled.  (AR 360-362).  V.S.'s mother testified to a similar trend, although she submitted that he did not have serious problems in fourth grade.  (AR 371, 375-376).  She attributed his decline in sixth grade to the fact that he had been in very small classes of eight or so students in fifth grade, which had helped him to concentrate.  (AR 377-378, 387).  Now that he was back in the larger classroom, his grades were suffering again.  (*Id.*).

V.S.'s mother also testified that in the two years between visits with Dr. Braden, V.S. had only progressed academically about six months.  (AR 379).  She did, however, agree that V.S.'s intelligence was "about average."  (AR 370-371).

As to V.S.'s remaining attention problems, his mother testified that he was easily distracted, needed constant reminders to stay on track and avoid frustration, was still struggling with math, and had a limited ability to complete tasks.  (AR 380-381).  At the time of the hearing, V.S. had not yet received a seventh grade report card, but had received four "zeroes" and a 47 as grades.  (AR 362, 382).

V.S.'s mother testified that she currently works 25 hours per week at her job, and nothing relating to V.S. prevents her from working full-time.  (AR 364-365).

At the end of the hearing, counsel agreed that the record was adequately developed.  (AR 352-353, 384).

At the original October 25, 2006 hearing, V.S. testified that he was enrolled in special classes because he had a "hard time in ordinary classes."  (AR 402).  At that time, he received acceptable grades and did his homework.  (AR 403, 405).  His mother testified that he had severe

hearing loss.  (AR 408).  She thought that he had a "difficult time" at school absent accommodations.  (AR 409).  He did well at school, but only in special education classes, which involved increased attention from the teacher and a smaller classroom setting.  (AR 410).

### C.      Procedural Background

Santiago applied for a SSI benefits on behalf of V.S. on April 13, 2005, alleging that he became disabled on January 1, 2003.  (AR 91-93).[21]  The Commissioner denied her application initially on May 10, 2005, and upon reconsideration on September 29, 2005.  (AR 43-48, 51-54). An administrative hearing was held on October 25, 2006, at which both Santiago and V.S. testified.  (AR 391-414).[22]  On October 27, 2006, the ALJ issued a partially favorable decision, finding that V.S. had been disabled from January 1, 2003, through October 27, 2006, but not thereafter.  (AR 66-79).  The Appeals Council reversed the ALJ's decision on July 12, 2007, finding insufficient rationale and inadequate citation to the record. (AR 86-87).

A second hearing was held on September 17, 2007.  (AR 342-390).  Both Santiago, who was now represented by counsel, and V.S. testified.  (AR 342-390).  On September 19, 2007, the ALJ rendered a second decision, this time concluding that V.S. was not disabled.  (AR 18-36). The Appeals Counsil denied review on October 27, 2008, rendering the ALJ's September 19, 2007 decision the final decision of the Commissioner.  (AR 6-8).  *See* 20 C.F.R. § 405.450.

## II.     Analysis

### A.      Standard of Review

---

[21] Because the current claim is solely for SSI benefits, the relevant period begins with the application date. *See* 20 C.F.R. § 416.501.  Thus, evidence generated prior to the application date is relevant only to the extent that it sheds light upon V.S.'s condition as of May 2005.

[22] Santiago appeared *pro se* for this first hearing.  (AR 391-398).

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The ALJ's factual findings "if supported by substantial evidence, shall be conclusive," 42 U.S.C. § 405(g), because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ.  It does not fall on the reviewing Court."  *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards, and found facts based on the proper quantum of evidence."  *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).  Questions of law, to the extent that they are at issue in this appeal, are reviewed *de novo*.  *Seavey*, 276 F.3d at 9.

## B.  Standard for Entitlement to Minor Child SSI Benefits

The Social Security Act provides that a claimant seeking SSI benefits bears the burden of establishing that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).

In evaluating a minor child's claim of disability,  the ALJ is required to follow a three-part analysis.  First, the ALJ must determine if the claimant is performing any substantial gainful activity.  20 C.F.R. § 416.924(a).  Second, if the claimant is not performing gainful activity, the ALJ must consider if the claimant has an impairment or combination of impairments that is

severe.  *Id.*  If the claimant has a severe impairment, then the ALJ must determine if the

impairment meets, medically equals, or functionally equals a listed impairment.  *Id.*

In the case of a minor child, an impairment will functionally equal a listed impairment if

it "result[s] in 'marked' limitations in two domains of functioning or an 'extreme' limitation in

one domain. . . ."  20 C.F.R. § 416.926a(a).  The six domains that must be assessed in light of

this section are (1) acquiring and using information; (2) attending and completing tasks; (3)

interacting and relating with others; (4) moving about and manipulating objects; (5) caring for

one's self; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1)(i)-(vi).  A domain

of functioning will be considered to have a "marked" impairment if it "interferes seriously with

[one's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. §

416.926a(e)(2)(i).  A domain of functioning will be considered to have an "extreme" impairment

if it "interferes very seriously with [one's] ability to independently initiate, sustain, or complete

activities."  20 C.F.R. § 416.926a(e)(3)(i).

### C.    The ALJ's Findings

The ALJ determined that V.S. had not been under a "disability" at any time from the

alleged onset date through the date of his September 19, 2007 decision.  (AR 18-36).  In reaching

that conclusion, the ALJ considered (1) hearing testimony by both V.S. and his mother; (2)

psycho-educational reports, (3) medical records and evaluations; (4) school records and

questionnaires, and (5) opinions of three state agency consultants who reviewed the record on

behalf of Disability Determination Services.  (AR at 29-31).

Specifically, the ALJ found that V.S. had not engaged in any substantial gainful activity

since the alleged onset date.  (AR 25).  Next, he found that V.S. had three severe

18

impairments—attention deficit disorder ("ADD"), a learning disability, and hearing problems—as defined by 20 CFR § 416.924(c), but that these disorders did not meet, medically equal, or functionally equal the severity of any listed impairment.  (AR 25, 29).  The ALJ found that V.S. did not have "marked" or "extreme" limitations in any of the six domains of functioning.  (AR 31-36).

### D.    Plaintiff's Objections

As noted, plaintiff makes the following objections to the ALJ decision:  (1) that he failed to adequately address the evidence of record; (2) that he failed to assign appropriate weight to Dr. Braden's statements; (3) that he impermissibly viewed raw medical evidence without an expert's assistance; (4) that he failed to consider the effects of a supportive school environment; (5) that he improperly relied on an agency finding from before the date of onset; and (6) that he misapplied the agency's ruling regarding failure to comply with treatment.

The Court will begin by addressing plaintiff's fourth objection—that the ALJ failed to consider the effects of a supportive school environment—because it forms the basis of the Court's decision to remand.  Plaintiff contends that the ALJ failed to consider the effects of a structured or supportive environment in assessing the severity of V.S.'s impairments.  (Pl.'s Mem. at 15).  She asserts that the ALJ's failure to consider the modifications, accommodations, and enhanced special education services provided for V.S. at school constituted reversible error.  (*Id.*).

The record clearly indicates that V.S. received many accommodations for his impairments within the school environment.  A specialized IEP was prepared for him for the years 2004 through 2007.  Under these programs, V.S. was enrolled in several special education

classes which, at times, constituted 21-60% of his course load.  These classes provided him with lessons that were specifically designed to accommodate his limitations and a more favorable teacher-to-student ratio.

Moreover, even when V.S. was attending regular-education or "inclusion" classes, a special education teacher was present in the room to help him, if necessary.  The record also suggests that V.S. was provided with the following accommodations, wherever possible: distraction-free seating; small group or one-on-one instruction; concepts that were broken down into smaller parts; frequent redirection and repetition; monitoring for accuracy on independent work; the reading of grade level material to him; and the development of charts, reference sheets, number lines, and word banks to aid his memory.

Finally, to assist with his hearing problems, the school provided V.S. with access to an FM system and permitted him to sit toward the front of the classroom, where he was better able to hear the teacher.

In support of her argument that the ALJ erred by failing to consider these accommodations, and how V.S. might function outside of them, plaintiff cites to 20 C.F.R. § 416.924a (b)(5)(iv)(c).  That regulation provides:

> [ALJs] will consider [claimaint's] need for a structured setting and the degree of limitation in functioning [claimant has] or would have outside the structured setting. Even if [claimant is] able to function adequately in the structured or supportive setting, we must consider how [he] function[s] in other settings and whether [he] would continue to function at an adequate level without the structured or supportive setting.

According to plaintiff, the ALJ's findings do not indicate whether he considered V.S.'s academic functioning in light of his placement in special education classes and other accomodating school environments, in accordance with these requirements.

20

It is clear that the regulation requires the ALJ to consider the effects of a structured or highly supportive setting (such as V.S.'s specialized IEP program and accompanying special education classes) on the claimant's functioning and, if the claimant's symptoms or signs are controlled or reduced by the structured environment, the ALJ is required to consider the claimant's functioning outside of the highly structured setting. 20 C.F.R. § 416.924c(d).  Here, the Court finds that the ALJ failed to comply with the requirements of the regulation..

First, the ALJ did not discuss—or even mention—his obligations under § 416.924c(d) in his decision, and made no explicit analysis of the issue.  *See Pollard ex rel. T.W. v. Astrue*, No. 4:07CV1054-DJS, 2008 WL 2813340, at *14 (E.D. Mo. July 18, 2008) ("Without any discussion or analysis [by the ALJ] as to how [claimant] would function outside of her supportive setting" the court could only speculate as to how ALJ would have ruled on the issue).  While the regulations only require an ALJ to consider, not necessarily to discuss, the effects of a structured setting, many courts have remanded when it is evident that an ALJ did not even consider the factor.  *See McClain v. Barnhart*, 299 F. Supp. 2d 309, 326 (S.D.N.Y. 2004) (finding the ALJ's conclusion was unsupported by substantial evidence in part because the ALJ failed to consider that the child's improvements in behavior occurred only in the structured setting of a special education class); *Thompson v. Barnhart*, No. No. 02 CV 4930, 2004 WL 896663(SJ), at *7 (E.D.N.Y. Mar. 26, 2004) (noting that the ALJ failed to consider the child's functioning outside a structured setting where the ALJ specifically relied upon evidence that the child "responded well to the structured milieu"); *see also Watson ex rel. K.L.W. v. Astrue*, No. 07-CV-6417T, 2008 WL 3200240, at *4-5 (W.D.N.Y. Aug. 5, 2008) (finding that the ALJ did not err because he considered the child claimant's functional capacity outside structured settings).

21

Second, the ALJ's decision does not contain any discussion of V.S.'s functioning outside of the structured class environment.  Even were the Court to assume that an ALJ's *implicit* consideration of a structured environment could provide substantial evidence to support the ALJ's determination, the ALJ did not provide any indication that he considered the role of V.S.'s structured schooling environment.

To put it another way, some courts have found that, even in the absence of an explicit § 416.924a (b)(5)(iv)(c) analysis, an ALJ decision can be upheld if it implicitly addresses the issue by referencing the claimant's behavior both in and out of the structured environment.  *See Watson* at *5 ("Although the ALJ did not explicitly address the issue of how [claimant] might function outside of structured settings, he considered all of the medical, non-medical, and educational evidence presented by the plaintiff, including how [claimant] interacted with other children during unstructured periods of recreation and play."); *Sarauw v. Barnhart*, No. 05 Civ. 5794(HB), 2006 WL 2135775 (S.D.N.Y. August 1, 2006) (affirming ALJ decision, despite absence of explit discussion of § 416.924a (b)(5)(iv)(c), because ALJ considered claimant's functioning outside of the classroom environment).  Here, however, the ALJ does not make any reference to V.S.'s activities outside of the classroom.  (AR 21-36).  While the record included information about V.S.'s participation in sports and his behavior at home, the ALJ did not discuss these factors in his decision.  (*Id.*).

Third, the ALJ made several comments about V.S.'s academic progress without discussing the effect that the structured setting may have had on his improvement.  (AR 27-28). While the ALJ refers to a number of positive comments made about V.S.'s academic performance by both his mother and his physicians, he did not indicate that these comments

came while V.S. was receiving support and special accommodations in his school setting. (*Id.*).[23]
Certainly, if the ALJ had considered the effect of V.S.'s structured school environment, he
would have at least mentioned the accommodating environment that corresponded with V.S.'s
improved academic performance.

Fourth, the ALJ did not discuss whether V.S. is likely to continue his progress or
maintain his level of achievment outside of the IEP's structured environment.  It may very well
be that the ALJ did consider such information, but because it is absent from the record, the Court
cannot conduct a meaningful review.

In sum, the ALJ may have considered and for valid reasons determined that V.S. would
have functioned adequately outside of his structured academic setting.  Because, however, he did
not explicitly address these matters, this Court is unable to determine whether any such rejection
is based on substantial evidence.  This Court cannot speculate as to whether or why an ALJ made
a specific finding, unless he has provided a reasoned analysis for his decision.  In cases where
such speculation is required, remand is necessary to fill the void in the record.

Thus, this Court is constrained to recommend that this case be remanded for further
administrative review. The ALJ must analyze the impact of the structured educational setting on
V.S.'s progress and whether he would be able to maintain an equivalent level of functioning
outside the structured confines of the program.

---

[23] Among other observations, the ALJ notes the following: (1) 9/2005 - "school [was] going well"; (2)
8/2005 - V.S. was a "good student"; (3) 4/2006 - "significant improvement in grades" and "made honor roll"; (4)
2/2007 - "report card is good"; and (5) V.S. has never been held back.  (AR 27-28).  Comments (1) - (4) were all
made while V.S. was enrolled in an IEP, and therefore receiving special accommodations from his school.  (AR 114-
116-119, 100-112, 172) (the IEP's spanned the period from 5/7/2003 through 3/3/2007, without any gaps).
Comment (5) goes to the entirety of V.S.'s educational history, a good deal of which included significant
accommodations from his school.  (*Id.*) (V.S.'s IEP programs from 5/2003-3/2007); (AR 229) (Dr. Tuniewicz
referencing V.S.'s extended day program in 2001).

As expressed above, plaintiff has asserted five other arguments upon which the ALJ's decision should be reversed.   However, because the Court will remand the matter on grounds that the ALJ did not meet the requirements of § 416.924a (b)(5)(iv)(c), the Court need not decide these issues at this time.

### III.  Conclusion

For the foregoing reasons, plaintiff's motion for an order to reverse the final decision of the Commissioner of the Social Security Administration is GRANTED, and defendant's motion to affirm the action of the Commissioner is DENIED.  The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

**So Ordered.**


 /s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: March 31, 2010